**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RICHARD S.,**

        **Plaintiff,**

v.                                 **Civil Action 2:21-cv-5900
Judge Edmund A. Sargus, Jr.
Magistrate Judge Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Richard S. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.  BACKGROUND**

On June 21, 2019, Plaintiff protectively filed an application for DIB alleging disability beginning August 1, 2017, due to a deviated septum, double carpal tunnel surgery, double inguinal hernia surgery, neck, middle of shoulders injury, back and hip pain, colitis, acid reflux, high blood pressure, fatigue, low testosterone. (Tr. 137–40, 156). After his application was denied both initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephonic hearing. (Tr. 31–59). The ALJ denied Plaintiff's application in a written decision on November 16, 2020. (Tr. 12–30). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on December 24, 2021 (Doc. 1), and the Commissioner filed the administrative record on February 8, 2022 (Doc. 6). The matter has been briefed and is ripe for consideration. (Docs. 8, 10).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony from the administrative hearing as follows:

> [Plaintiff] is not able to work due to severe body and joint pain and fatigue. He also has severe pain in his spine, ankles, and wrists. It is difficult for him to go up and down stairs. He is "exhausted" and has "zero energy" in part due to his pain medication. He estimates his pain medication has helped get his pain down to a 5-6/10 severity, down from an 8-9/10. He has a history of surgery on his right knee, which was helpful. He does not use an assistive device to ambulate. He has a history of surgery of his right wrist, and continues to have some numbness and "locking" in that hand. He would have trouble writing for long periods of time. He is able to open a pickle jar. He has a history of hernia repair, and he has some scar tissue and pain related to that procedure. He has pain when he turns and leans. He also has numbness in his right lower extremity. He estimates he can lift a maximum of 20-25 pounds, though this varies from day to day. He can stand and do the dishes for 15-20 minutes before needing to stop and take a break. He has trouble sitting on hard stools or chairs due to back pain, but otherwise sitting on a cushion or recliner is comfortable for him. He estimates he can walk for about a half hour at a time before needing a break. His pain does affect his concentration and his ability to find the right words. He gets frustrated and "depressed" due to his inability to do things he used to do. He has good days and bad. He testified he does not have chronic headaches or migraines.
>
> As for activities of daily living, he does continue to do some auto repair work, but will only work when he is physically able to, and jobs can take him several days to finish. In a typical day, he will get up in the morning and let the dogs out. He will do some chores around the house. He will mow the lawn and pull weeds, though these activities take him much longer than they used to due to pain and fatigue. He will take breaks and rest as needed when doing yard work. He uses a riding mower to mow the lawn.

(Tr. 21).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records and symptoms as follows:

> As for [Plaintiff's] allegations and treatment related to his pain and fatigue, to begin, prior to the period at issue in 2016, [Plaintiff] underwent chiropractic treatment for his cervical and lumbar spine issues (Ex. 1F). He reported long

standing neck pain in September 2017 (Ex. 3F/10). In November 2017, he complained of fatigue and lack of energy (Ex. 2/1). In March 2018, [Plaintiff] was able to put a liner in his chimney and he was able to "quickly climb down off the roof" and chase down another person who had collided with his wife's car (Ex. 3F/7). He had continued fatigue, back pain, and hip pain in April 2018 (Ex. 3F/3). His energy level remained low in December 2018 (Ex. 3F/1). He had low energy and moderate fatigue in April 2019 (Ex. 5F/1). He also reported joint pain throughout his body. The following month, [Plaintiff] reported he "felt great" while taking prednisone, but his joint pain returned after he stopped taking it (Ex. 5F/5). His pain was a 1 out of 10 severity at this time (Ex. 6F/10). In July 2019, [Plaintiff] reported persistent back pain (somewhat improved with Celebrex) and worsening fatigue (Ex. 6F/13). He rated his pain a 3 out of 10 severity. During the August 2019 consultative examination, [Plaintiff] reported back, hip, right leg and neck pain, as well as right hand numbness (Ex. 8F/2). He continued to have fatigue issues at this time (Ex. 7F/11). In October 2019, he reported a few weeks history of moderate right knee pain, swelling, and instability (Ex. 10F/1). He had a history of twisting injury and hearing a pop. He subsequently reported a restriction of activities such as walking, running, and exercise. The following month, he underwent arthroscopic surgery on his right knee (Ex. 10F/12). He reported no side effects from his pain medication in November 2019 (Ex. 13F/4). In January 2020, [Plaintiff] reported worsening fatigue, joint pain and tenderness, and leg numbness (Ex. 11F/28). His pain was at an 8 out of 10 severity.

More recently, in February and May 2020, [Plaintiff] reported arthropathy at multiple sites as well as some fatigue, but also noted his pain and fatigue condition was stable overall (Ex. 11F/17, 22). His pain was at a 2 out of 10 severity. He reported his higher dose of gabapentin was helping and that he had increased pain if/when he missed his medication dose. He also reported that his leg numbness was improved with medication. He reported a history of hernia surgery in 2000, which has left him with scar tissue and other complications (Ex. 8F/2). His ventral hernia was noted to possibly be contributing to his dyspnea in the more recent record (Ex. 11F/22).

As noted above, the musculoskeletal and neurological testing was largely unremarkable. For example, a neurologic examination was unremarkable in November 2017 and again in March 2018 (Ex. 2F/2 and 3F/8). Swallow testing was grossly within normal limits in January 2018 (Ex. 4F/5). In September 2018, [Plaintiff] had normal musculature, no joint effusions, and no limited range of motion of major joints (Ex. 9F/5). He was neurologically intact. An examination in April 2019 showed no swelling or deformity and [Plaintiff] was neurologically intact (Ex. 5F/2). In May 2019, [Plaintiff] had mild tenderness in his hands, mild Heberden/Bouchard nodes, and mildly limited range of motion (Ex. 6F/6). His gait was slow during the August 2019 consultative examination (Ex. 8F/2). After an injury to his right knee in October 2019, he reported tenderness, diminished range of motion, intact stability, and diminished strength in his knee (Ex. 10F/1). No

3

musculoskeletal swelling or deformity was noted upon examination in November 2019 (Ex. 13F/5). [Plaintiff] was neurologically intact.

The diagnostic imaging findings in the record do support underlying spine issues, though the more recent imaging does not show any severe issues in either the spine or elsewhere. Imaging in late 2019 does show a meniscus tear and sprain of the right knee which was surgically repaired. To begin, it should be noted that remote imaging of the left hip showed arthritis (Ex. 5F/8). X-rays in June 2016 showed moderate to severe decreased disc height at the cervical spine and mild degenerative disease throughout the remainder of the spine (Ex. 1F/1). Imaging of the neck in October 2017 showed unremarkable soft tissue (Ex. 4F/42). X-rays of the bilateral wrists in April 2019 showed no acute abnormalities and were unremarkable (Ex. 3F/13). X-rays of the ankles were likewise unremarkable (Ex. 4F/92). X-rays of the cervical spine in April 2019 show multilevel cervical spondylosis and bilateral neural foraminal osseous encroachment that may have been accentuated by [Plaintiff]'s positioning (Ex. 3F/15). X-rays of the lumbar spine in April 2019 show minimal endplate disc degenerative changes, and were otherwise unremarkable (Ex. 3F/16). X-rays of the pelvis and hips in May 2019 showed no acute osseous abnormality and no significant degenerative changes (Ex. 4F/100). An MRI of the right knee in October 2019 showed radial tear of the meniscus, low grade sprain of ACL and MCL, small joint effusion, and chondral loss (Ex. 7F/29).

(Tr. 22–23).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through September 30, 2023 and has not engaged in substantial gainful employment since his alleged onset date of August 1, 2017. (Tr. 17). The ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine; spondylosis; chronic pain syndrome; arthritis; osteoarthritis of the hips; arthropathy, multiple sites, including status post-surgery of the right knee; status post micro surgery of the right wrist for severed tendon; fibromyalgia; and hernia. (Tr. 17–18). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment. (Tr. 19).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except foot control operation is limited to frequent; push/pull is

4

>limited to frequent and to exertional weight limits; he can never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally climb ramps or stairs, kneel, crouch, or crawl; overhead reaching is limited to occasional, while forward and lateral reaching is unlimited; handling is limited to frequent; no concentrated exposure to extreme cold; no concentrated exposure to vibration; and no exposure to unprotected heights.

(Tr. 20).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence." (Tr. 21).

Relying on the vocational expert's testimony, the ALJ determined that Plaintiff was unable to perform his past relevant work as an auto mechanic but he could perform other jobs that exist in significant numbers in the national economy such as a merchandise marker, sorter, or palletizer. (Tr. 24–26). He therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, at any time since August 1, 2017. (Tr. 26).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL

5

4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff alleges the ALJ's RFC is not supported by substantial evidence, because Plaintiff cannot perform the standing and walking required for light work. (Doc. 8 at 5–7). Plaintiff also alleges that the ALJ failed to consider fibromyalgia's effects on his ability to sustain work. (*Id.* at 4–11). The Commissioner counters that the ALJ found Plaintiff had severe impairments and carefully reviewed the record, ultimately assessing a reasonable and comprehensive RFC for a restricted range of light work. (Doc. 10 at 6–9). The Commissioner also says the ALJ reasonably evaluated Plaintiff's fibromyalgia under Social Security Ruling ("SSR") 12-2p and found the requirements for any listing unmet. (*Id.* at 3–6).

### A. RFC Determination

As noted, Plaintiff challenges the ALJ's RFC determination. Because Plaintiff filed his application after March 27, 2017, it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. § 416.913(a), 416.920c (2017). A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id*. The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. § 404.1513(a)(1)–(5).

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)–(5).  Although there are five factors, supportability and consistency are key, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2).  And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so.  *Id*.  If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . . . "  20 C.F.R. § 404.1520c(b)(3).

When discussing the medical opinions in determining Plaintiff's RFC, the ALJ found:

> As for the opinion evidence, the reviewing physician opinions with the State Agency Division of Disability Determinations (DDD) are persuasive overall (Ex. 2A and 4A). The state agency physical consultants at both the initial and reconsideration levels opined that [Plaintiff] was limited to the light exertional level with frequent pushing and pulling in the upper and lower extremities; no climbing of ladders, ropes, or scaffolds; occasional climbing ramps/stairs, kneeling, crouching, and crawling; frequent balancing and stooping; occasional reaching overhead bilaterally; and must avoid concentrated exposure to extreme cold, vibration, and hazards such as heights. These opinions are supported by the bulk of the objective medical evidence in the record in which [Plaintiff] reported ongoing issues with pain and fatigue, but physical examinations were largely unremarkable and [Plaintiff] reported a continued ability to do some auto repair work after the

---

20 C.F.R § 404.1513(a)(2), (5).

> alleged onset date, which is a medium level of exertion (though at a slower pace). The undersigned also notes that the reported ability to climb and work on a chimney and to chase another individual suggest a greater ability to function than [Plaintiff] has alleged. Moreover, state agency medical consultants are highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act. In this instance, their opinions are well-supported by the medical evidence of record. However, the undersigned has added a handling limitation to the frequent level, considering [Plaintiff]'s history of wrist surgery and his testimony regarding his manipulative issues.

(Tr. 23–24).

Upon review, it appears that Plaintiff challenges a narrow piece of the RFC. He argues that he cannot do the walking or standing required by light work given his physical impairments. (Doc. 8 at 5–7). First, it should be noted that a job may be characterized as "light" on the basis that it involves a "good deal of walking or standing," or "*sitting most of the time* with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). (emphasis added); *see also* SSR 83-10p, 1983 WL 31251, *5 (S.S.A. 1983) ("A job is also in [the light] category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls which require greater exertion than in sedentary work"). So, even if Plaintiff could not stand/walk for six hours, it is possible that he could still perform light work because he could perform the lifting and carrying requirements as the vocational expert testified. The Court, however, need not resolve the issue.

Even if Plaintiff is correct about what light work requires, substantial evidence supports the ALJ's determination that Plaintiff could perform light work that requires standing/walking for six hours. The ALJ acknowledged that the Plaintiff claims he cannot stand for longer than fifteen to twenty minutes or walk for longer than thirty minutes without needing a break. (Tr. 21, 44, 45). However, the ALJ properly highlighted that Plaintiff's claims are not entirely consistent with the medical evidence in the record. (Tr. 21). Plaintiff's pain is managed with medication, and he reportedly feels "great" while taking prednisone. (Tr. 381). Notably, Plaintiff reported his pain as

8

a 2 out of 10 in severity in May 2020. (Tr. 517). And the objective medical evidence supports such a measure. As of September 2018, Plaintiff had normal musculature, no joint effusions, and no limitations to range of motion. (Tr. 458). And though Plaintiff reported an injury to his right knee in October 2019 (Tr. 475), no musculoskeletal swelling or deformity was noted upon examination in November 2019. (Tr. 584). Further, while diagnostic imaging in the record shows some spinal issues, more recent x-rays of the lumbar spine, pelvis, and hips show minimal disc degeneration and were otherwise unremarkable. (Tr. 270–271).

Beyond the medical records, the ALJ relied on the state agency physicians. At the initial and reconsiderations stages, the state agency physicians determined that Plaintiff could perform a range of light work that involved six hours of standing and/or walking in an eight-hour work day despite his impairments. (Tr. 61–69, 71–78). The ALJ found the assessments persuasive as they were consistent with the record evidence, which noted that, while Plaintiff experiences issues with pain and fatigue, physical examinations were largely unremarkable and Plaintiff continued to do some auto repair work after the alleged onset date. (Tr. 37, 270–71). The ALJ reasonably relied upon the state agency reviewers' assessments. *See* 20 C.F.R. §§ 416.913 a(b)(1) ("[O]ur Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."). In addition to being disability experts, the state agency reviewing physicians are also known as neutral sources. *See Lucido v. Barnhart*, 121 F. App'x 619, 622 (6th Cir. 2005) ("[T]he reviewing physicians . . . have the strongest claims to neutrality.").

The ALJ also considered Plaintiff's daily activities. Plaintiff reported that he does continue to do some auto repair work. (Tr. 37). He does chores around the house, cares for his dogs, mows the lawn, and pulls weeds. (Tr. 42). The ALJ also noted that Plaintiff was able to put a liner in his chimney and climb down off the roof quickly to chase down a person who had collided with his

9

wife's car. (Tr. 262). Plaintiff's range of activities provide additional support for the ALJ's RFC finding. *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (noting that a claimant's ability to perform household and social activities on a daily basis may be contrary to a finding of disability).

In sum, the ALJ considered the entire record—including the medical treatment and findings, the state agency assessments, and Plaintiff's reported activities—to formulate the RFC finding. Substantial evidence supports the ALJ's decision, and this Court will not disturb it. *See Her v. Comm'r of Soc*. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

### B. Analysis of Fibromyalgia

Plaintiff next alleges that the ALJ committed reversible error, because he improperly evaluated Plaintiff's fibromyalgia and its symptoms. (Doc. 8 at 7–11). When discussing Plaintiff's fibromyalgia, the ALJ found at Step 2 that it was a severe impairment, but at Step 3, that it did not meet or medically equal any listed impairments. (Tr. 17–20). The ALJ determined:

> The undersigned has also considered [Plaintiff]'s fibromyalgia under Social Security Ruling 12-2p. As noted therein, there is no Listing for fibromyalgia. Regarding the issue of equivalency, there is no evidence to show that this condition closely approximates the requirements of any impairment in Appendix 1 in terms of severity or duration.

(Tr. 20).

SSR 12-2p requires only that, after a finding that Plaintiff's fibromyalgia was a medically determinable impairment, the ALJ consider fibromyalgia in the remaining steps of the sequential evaluation process.

> SSR 12-2p describes criteria for establishing that a person has a medically determinable impairment [ ] of fibromyalgia , id. at *2–3, the sources of evidence the ALJ may look to, id. at *3–4, and how a claimant's subjective assertions of pain and functional limitations are evaluated, id. at *4. [SSR 12-2p] also states that

10

>fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other claims for SSI. Id. at *5–6. Importantly, ... SSR 12-2p ... merely provides guidance on how to apply pre-existing rules when faced with a claimant asserting disability based on fibromyalgia.

*Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 398–99 (6th Cir. 2016). Simply put, "a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits[.]" *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (emphasis in original) (citing *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [claimant] is one of the minority.") (citations omitted)). As such, in claims involving fibromyalgia, an ALJ must "decide. . . if the claimant's pain is so severe as to impose limitations rendering her disabled." *Markesha D. v. Comm'r of Soc. Sec.,* No. 2:21-CV-4515, 2022 WL 1701915 (S.D. Ohio May 27, 2022), report and recommendation adopted, No. 2:21-CV-4515, 2022 WL 4094511 (S.D. Ohio Sept. 7, 2022) (citations omitted).

Plaintiff argues that: (1) though "the ALJ determined that [Plaintiff]'s fibromyalgia was a severe impairment, he failed to include accommodations in the residual functional capacity determination for [his]'s chronic pain and fatigue and to consider [his] resulting inability to perform substantial gainful activity on a sustained basis, without additional absences and time off task[;]" and (2) the ALJ failed to properly evaluate whether his fibromyalgia equaled any disability listings at Step Three. (Doc. 8 at 8–11).

First, after determining that Plaintiff's fibromyalgia constituted a severe impairment (Tr. 17–18), the ALJ explained how he arrived at the Plaintiff's RFC (Tr. 20–24). Beyond broadly suggesting he would require additional absences or time off-task, Plaintiff does not explain how the RFC limitations set forth by the ALJ are insufficient or propose specific additional limitations that result from his fibromyalgia. More still, even if Plaintiff better explained his argument that the

11

RFC inadequately addresses his fibromyalgia, the Undersigned finds no error in the ALJ's fibromyalgia analysis. The ALJ set forth a number of limitations in his RFC determination that accommodate for pain and fatigue, including no concentrated exposure to extreme cold and vibration; never climbing ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs, kneeling, crouching, or crawling; only occasional overhead reaching; and only frequent foot control operation. (Tr. 20).

The ALJ also thoroughly addressed pain and fatigue in explaining how he arrived at the RFC:

> With respect to the claimant allegations of pain and fatigue, the record does support some issues with ongoing joint and back pain as well as low energy level and fatigue during the period at issue. However, the claimant reported having an ability to climb a roof and put a liner on a chimney during the relevant period and he was also able to "chase down another person" after a collision with his wife's car. The claimant also testified that he has been able to do some auto repair work after the alleged onset date, which is a medium level of exertion per the DOT. However, the claimant did testify that this work takes him longer than it used to due to his pain and fatigue. Moreover, the claimant rated his pain at a 1 to 3 out of 10 severity at several points in the record, and noted that his medication was quite helpful for his pain symptoms. He also indicated that his medication did not cause any side effects during an office visit, which is contrary to his testimony. Notably too, the neurological and musculoskeletal examinations throughout the record were largely unremarkable. For these reasons, the objective record does not fully support the claimant's testimony at the hearing.
>
> As for his allegations and treatment related to his pain and fatigue, to begin, prior to the period at issue in 2016, the claimant underwent chiropractic treatment for his cervical and lumbar spine issues (Ex. 1F). He reported long standing neck pain in September 2017 (Ex. 3F/10). In November 2017, he complained of fatigue and lack of energy (Ex. 2/1). In March 2018, the claimant was able to put a liner in his chimney and he was able to "quickly climb down off the roof" and chase down another person who had collided with his wife's car (Ex. 3F/7). He had continued fatigue, back pain, and hip pain in April 2018 (Ex. 3F/3). His energy level remained low in December 2018 (Ex. 3F/1). He had low energy and moderate fatigue in April 2019 (Ex. 5F/1). He also reported joint pain throughout his body. The following month, the claimant reported he "felt great" while taking prednisone, but his joint pain returned after he stopped taking it (Ex. 5F/5). His pain was a 1 out of 10 severity at this time (Ex. 6F/10). In July 2019, the claimant reported persistent back pain (somewhat improved with Celebrex) and worsening fatigue (Ex. 6F/13). He rated

>his pain a 3 out of 10 severity. During the August 2019 consultative examination, the claimant reported back, hip, right leg and neck pain, as well as right hand numbness (Ex. 8F/2). He continued to have fatigue issues at this time (Ex. 7F/11). In October 2019, he reported a few weeks history of moderate right knee pain, swelling, and instability (Ex. 10F/1). He had a history of twisting injury and hearing a pop. He subsequently reported a restriction of activities such as walking, running, and exercise. The following month, he underwent arthroscopic surgery on his right knee (Ex. 10F/12). He reported no side effects from his pain medication in November 2019 (Ex. 13F/4). In January 2020, the claimant reported worsening fatigue, joint pain and tenderness, and leg numbness (Ex. 11F/28). His pain was at an 8 out of 10 severity.
>
> More recently, in February and May 2020, the claimant reported arthropathy at multiple sites as well as some fatigue, but also noted his pain and fatigue condition was stable overall (Ex. 11F/17, 22). His pain was at a 2 out of 10 severity. He reported his higher dose of gabapentin was helping and that he had increased pain if/when he missed his medication dose. He also reported that his leg numbness was improved with medication. He reported a history of hernia surgery in 2000, which has left him with scar tissue and other complications (Ex. 8F/2). His ventral hernia was noted to possibly be contributing to his dyspnea in the more recent record (Ex. 11F/22).

(Tr. 21–22). At base, after a careful review of the objective medical evidence and Plaintiff's subjective reporting of symptoms and activities of daily living, the ALJ found no need to include absence or time-off-task accommodations into the RFC. Likewise, neither state agency physician recommended any such accommodations. (Tr. 61–69, 71–78). Accordingly, substantial evidence supports the ALJ's consideration of fibromyalgia in determining what RFC is appropriate for Plaintiff's case.

Second, the Undersigned finds no error in the ALJ's determination that Plaintiff's fibromyalgia does not medically equal a listing in the Listing of Impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ analyzed Listings 1.04 (Disorders of the spine) and 1.02 (Major dysfunction of a joint). (Tr. 20). The ALJ also considered the Plaintiff's fibromyalgia under Social Security Ruling 12-2p. Further, he stated "there is no Listing for fibromyalgia. Regarding the issue of equivalency, there is no evidence to show that this condition closely approximates the

13

requirements of any impairment in Appendix 1 in terms of severity or duration." (*Id.*) Yet, Plaintiff contends that this brief statement was insufficient to address whether his fibromyalgia medically equals a listing.

Plaintiff puts the bar for the ALJ too high. The ALJ is required to a find a claimant disabled if he meets or medically equals a listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). But neither the Listings nor the Sixth Circuit require the ALJ to "discuss listings that the applicant clearly does not meet" or to "address every listing." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). Instead, an ALJ should discuss a relevant listing where the record raises "a substantial question as to whether [the claimant] could qualify as disabled" under the listing. *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir.1990). The Sixth Circuit has held that "[a] claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432–33 (6th Cir. 2014) (citing *Sheeks*, 544 F. App'x at 641–42 (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing)).

Rather, a claimant must "point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify.") and *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding that it was not harmless error for the ALJ to fail to analyze Step Three as to an impairment found

14

to be severe at Step Two where the claimant put forth evidence that could meet the relevant listing)). Absent such evidence, the ALJ does not commit a reversible error by neglecting to assess a listing at Step Three. *Smith-Johnson*, 579 F. App'x at 433.

Plaintiff must therefore direct the Court to evidence in the record that raises "a substantial question" as to whether his fibromyalgia equals a specific listing. Plaintiff does not argue that his fibromyalgia medically equals any listing; he states only that his "his fibromyalgia symptoms, signs, and co-occurring conditions[,]" which include "chronic fatigue; anxiety; headaches throughout his medical record; tender points throughout his body; GERD; rash; numbness, tingling, stiffness; low energy level, anhedonia[,]" warrant a more extensive discussion of equivalency by the ALJ. (Doc. 8 at 8). Again, Plaintiff has failed to show the Court evidence that his symptoms medically equal a specific listing.

However, even if Plaintiff's fibromyalgia is evaluated in relation to the example listing in SSR 12-2p, Listing 14.09D, Plaintiff has not identified evidence that he meets all the requirements. Listing 14.09D requires:

> D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>     1. Limitation of activities of daily living.
>     2. Limitation in maintaining social functioning.
>     3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09D. Plaintiff has identified evidence of chronic fatigue but fails to direct the Court to any other constitutional signs or symptoms. Accordingly, Plaintiff has not raised a substantial question as to whether his fibromyalgia meets or medically equals the criteria of Listing 14.09D or any other Listing.

**IV. CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   October 17, 2022                         /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE